IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-106

Filed 31 December 2024

Wake County, Nos. 20 CRS 209300; 21 CRS 1038; 22 CRS 810

STATE OF NORTH CAROLINA

v.

AARON LANCE STEPHEN, Defendant.

Appeal by defendant from judgments entered 31 January 2023 by Judge Paul Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 25 September 2024.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Derrick C. Mertz, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Aaron Thomas Johnson, for defendant-appellant.*

THOMPSON, Judge.

Defendant Aaron Stephen (defendant) appeals his convictions for first-degree murder, concealing death by disturbing or dismembering human remains, and possession of a firearm by a felon. After careful consideration of the record, we find no error by the trial court.

## I. Factual Background and Procedural History

On 21 July 2020, defendant was indicted for first-degree murder in the death of Kelly Diane Johnson (Kelly). On 14 September 2021, defendant was indicted for

concealing a death by disturbing or dismembering human remains in the death of Kelly. On 13 December 2022, defendant was indicted for possession of a firearm by a felon. Defendant's case came on for trial at the 23 January 2023 Criminal Session of Wake County Superior Court, and the evidence presented at trial tended to show the following:

In December of 2019, defendant and Kelly began dating and shortly thereafter, in March of 2020, Kelly moved in with defendant.

Danielle Cameron (Cameron), the Medicaid case worker assigned to Kelly in 2018, testified that when she spoke with Kelly in February 2020, Kelly advised Cameron that her relationship with defendant was not working out, and in response to Kelly's inquiry about domestic violence counseling, Cameron referred her to the Compass Center.[1]

A neighbor who lived across the street from defendant's house revealed that the neighbor's Ring camera recorded Kelly and defendant outside the residence on 31 May 2020 at 7:29 a.m., and defendant was screaming obscenities at Kelly and telling her to "[p]ack [her] f***ing bags."

On 6 June 2020, Kelly worked her shift at Walmart but failed to report for her next scheduled workday on 10 June 2020. Based on cell phone records obtained by law enforcement, Kelly called her mother from the home she shared with defendant

---

[1] The Compass Center offers counseling, financial education, and domestic violence counseling.

on 7 June 2020. On 8 June 2020, the neighbor's Ring camera recorded Kelly arriving home at 9:02 a.m., and cell phone records showed defendant placed two calls to Kelly's phone and sent a text that same afternoon. Another neighbor of defendant's testified at trial that he was outside in the early morning hours of 9 June 2020 and heard a woman screaming, "No, no. Stop. No." A third neighbor who lived behind the house where Kelly and defendant resided heard the couple arguing loudly and angrily while that neighbor walked her dog between 2:00 a.m. and 3:30 a.m. on 9 June 2020. As that individual walked through her back yard, she observed the couple in their home arguing for "seven to ten minutes" before they disappeared from her view of their window.

Kim Johnson (Kim), Kelly's mother, called and texted Kelly several times between 7 June 2020 and 9 June 2020, but Kelly never responded. Kim testified that she and Kelly had a close relationship, and they spoke to each other on a daily basis. However, after not hearing from Kelly for a few days, Kim began to worry about Kelly. Based on her concern for her daughter, Kim decided to travel to defendant's house to check on Kelly. When Kim arrived, she saw Kelly's car in the driveway, but it did not appear that anyone was home. Kim knocked on the front door and rang the doorbell to no avail.

On the morning of 13 June 2020, Kim finally spoke with defendant who told Kim that he did not know where Kelly was and had "been trying to find her [him]self." At that point, Kim contacted the Wake County Sheriff's Office (WCSO).

Investigator Midgette (Midgette) from the WCSO went to defendant's home on the morning of 13 June 2020 and found Kelly's car in the driveway. Midgette called and spoke with defendant, who told Midgette that he had not seen Kelly since 9 June 2020 and that he was at work in Chapel Hill (Orange County). However, defendant's cellphone records revealed that defendant had not been in Chapel Hill when he spoke with Midgette on the morning of 13 June 2020 but had been in the area of Interstate 40 and Highway 42 (Johnston County). By early afternoon that same day, the records showed defendant's phone in Virginia—first in Emporia and then moving east to Franklin, Virginia. Officers from the WCSO traveled to Virginia in an attempt to locate defendant.

At approximately 9:20 p.m. on 13 June 2020, the WCSO officers found defendant at a Quality Inn, and he was arrested by the Southampton County, Virginia Sheriff's Office. Once defendant was taken into custody, a search of defendant's vehicle revealed a large trash can in the trunk in which blood and a pickaxe were found.

Investigators interviewed defendant over the course of several days. After some time had passed, defendant told investigators that he came home to find "the chick blew her brains out in the bathroom . . . with a handgun[,]" and he had lied about not knowing where Kelly was because he felt that law enforcement would never believe him. During the interview when defendant was asked if there was blood everywhere, defendant responded, "Nah, when [Kelly] shot herself, some pieces went

everywhere. But the majority of the blood went down the drain. And [defendant] could tell it was a lot."

The investigators continued to question defendant about the location of Kelly's body, and while defendant was initially evasive and uncooperative, he eventually gave the officers detailed directions to where he left her body. Kelly's dismembered body was subsequently recovered in Franklin, Virginia; her partially decapitated torso, missing both hands, was found in a "very secluded, very rural" area—with one of her hands located several yards away from the body—while her head and her other hand, as well as a gun, were removed from a dumpster behind a Walmart in Franklin. Thereafter, defendant was charged with the murder of Kelly Johnson.

Relevant to this appeal are the theories discussed in the State and defendant's opening statements to the jury, as well as evidence introduced during the State's case in chief. During its opening statement, the State gave a summary of everything that led up to trial—Kim losing contact with Kelly which ultimately prompted her decision to get law enforcement involved, law enforcement making contact with defendant, defendant offering law enforcement several stories as to what happened to Kelly, and defendant eventually leading law enforcement to Kelly's remains—and the State gave a forecast of the evidence that would be presented during the trial. The State proclaimed to the jury that in its closing argument, it would "put all the pieces" of the story together for the jury and ask them to find defendant guilty of murder, dismemberment and concealment of human remains, and possession of a firearm by

a felon.

In contrast, during defendant's opening statement to the jury, his counsel indicated to the jury that defendant did not kill Kelly, but instead, he came home from work one day to find "Kelly lying in the bathtub, dead, with a gunshot wound to her head" and defendant assumed that Kelly committed suicide. Defendant's counsel told the jury that, after finding Kelly this way and experiencing a traumatic event such as this, defendant went on a "multi-day bender," drinking heavily, trying to figure out what to do with Kelly's body. Due to defendant's prior "run-ins with law enforcement[,]" defendant did not trust the government and believed that if he called law enforcement, he would be blamed for Kelly's death. Based on defendant's mistrust of the government and law enforcement, defense counsel explained that defendant "realize[d] that there[ was] really nothing that c[ould] be done at th[at] point," and because Kelly's body was still at defendant's house and it was summer, defendant needed to dispose of Kelly's body. Defendant decided to drive Kelly's body to Virginia, dig a hole and bury her. However, defendant abandoned that plan and dismembered her instead. Finally, defense counsel emphasized to the jury that the forensic pathologist who conducted the autopsy on Kelly could not definitively say whether Kelly's cause of death was homicide or suicide, and that based on the evidence that would be presented, the jury should return a verdict that defendant was not guilty of murdering Kelly.

In its case in chief, the State called twenty witnesses to testify and introduced

fifty-three exhibits. These exhibits included, *inter alia*: photos of Kelly's dismembered body parts in the locations where they were found; photos from defendant's house, including blood-stained carpet in the living room, and the bathtub in which Kelly allegedly shot herself; and photos of Kelly's skull and the multitude of bone fragments from the back of her skull.

Especially relevant to defendant's purported theory of Kelly committing suicide in the bathtub was the crime scene investigator's testimony. The State called Hannah Weenick, the City-County Bureau of Identification (CCBI) crime scene investigator in Kelly's case, to testify regarding her investigation of defendant's house. Weenick testified that when she arrived on scene, WCSO advised her that defendant "reported that [Kelly] had shot herself in the head in the hall bathroom and that [defendant] cleaned up the scene[.]" Weenick testified that while processing the bathtub—where defendant allegedly found Kelly—she used orange triangles as indicators of particularly small specks of blood so that they were more easily seen in photographs. Weenick testified that, as seen in State's Exhibit 28, slide 8, there was no real concentration of blood spatter, rather "it[ was] in a very random distribution, across multiple surfaces of [the] bathroom," even after the use of BlueStar.[2] Moreover, State's Exhibit 28, slide 8, tended to show that the random distribution of blood

---

[2] Weenick testified that BlueStar is a chemical sprayed on surfaces in search of blood that cannot be seen with the naked eye. Weenick testified further that BlueStar "react[s] with hemoglobin in blood[,]" and it can detect blood even if it has been diluted or cleaned up.

spatter was scattered on the front, back, and sidewalls of the bathtub.

As it relates to defendant's case in chief, defendant did not testify, nor did he put on any witnesses. On 31 January 2023, the jury returned guilty verdicts on all three charges against defendant. The court sentenced defendant to life imprisonment without parole on the first-degree murder conviction, a term of 121 months minimum and 158 months maximum for destroying a body and concealing an unnatural death, and a term of 19 months minimum and 32 months maximum for possession of a firearm by a felon, with the sentences to run consecutively. Defendant gave oral notice of appeal in open court.

## II. Discussion

### A.    Rule 702

On appeal, defendant contends that the trial court "plainly erred by allowing the State's forensic anthropologist, Dr. Tal Simmons, to give an opinion beyond her scope of expertise" in violation of Rule 702. We disagree.

#### 1.  Standard of review

Generally, "[a] trial court's ruling on Rule 702(a) is reviewed for abuse of discretion." *State v. Phillips*, 268 N.C. App. 623, 634, 836 S.E.2d 866, 873 (2019). However, "an unpreserved challenge to the performance of the trial court's gatekeeping function under Rule 702 in a criminal trial is subject to plain error review." *State v. Gray*, 259 N.C. App. 351, 354, 815 S.E.2d 736, 739 (2018). Thus, we review defendant's Rule 702(a) argument for plain error because defendant failed to

object to the challenged testimony at trial, and therefore the issue is unpreserved.

"To show plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Figueroa*, 291 N.C. App. 610, 612, 896 S.E.2d 188, 190 (2023) (internal quotation marks and citation omitted). In order to demonstrate that an error was fundamental, "a defendant must establish prejudice[,]" meaning that, "after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* at 612, 896 S.E.2d at 191 (citation omitted). "Because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 612–13, 896 S.E.2d at 191 (brackets and citation omitted). Moreover, "[t]he standard is so high[,] in part at least[,] because the defendant could have prevented any error by making a timely objection." *Id.* (internal quotation marks and citation omitted).

### 2. Analysis

According to the Evidence Code,

> [i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by *knowledge, skill, experience, training, or education*, may testify thereto *in the form of an opinion*, or otherwise, if all the following apply: (1) [t]he testimony is based upon sufficient facts or data[,] (2) [t]he testimony is the product of reliable principles and methods[, and] (3) [t]he witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a)(1-3) (2023) (emphases added). Moreover, "[i]n order to assist the trier of fact, expert testimony must provide insight beyond the conclusions that jurors can readily draw from their ordinary experience." *Phillips*, 268 N.C. App. at 634–35, 836 S.E.2d at 874 (citation omitted).

"When an expert witness moves beyond reporting what [s]he saw or experienced through her senses, and turns to interpretation or assessment to assist the jury based on h[er] specialized knowledge, she is rendering an expert opinion." *Id.* at 635, 836 S.E.2d at 874 (brackets and citation omitted). "Determining what constitutes expert opinion testimony requires a case-by-case inquiry in which the trial court (or a reviewing court) must look at the testimony as a whole and in context." *Id.* (brackets and citation omitted).

Defendant contends that Dr. Simmons' testimony regarding the fiberglass bathtub was beyond her scope of expertise. Conversely, the State argues that Dr. Simmons' testimony was within her scope of expertise. Because Dr. Simmons' testimony "move[d] beyond reporting what she [had] s[een] or experienced through her senses, and turn[ed] to interpretation or assessment to assist the jury based on her specialized knowledge," *Id.* at 635, 836 S.E.2d at 874 (brackets and citation omitted), her testimony constitutes "expert opinion testimony and interpretations subject to the requirements of Rule 702(a)." *Id.*

At trial, Dr. Simmons was tendered and qualified as an expert in forensic anthropology without objection from defendant. After being qualified as an expert,

Dr. Simmons testified that after reconstructing Kelly's skull, she was able to determine that the "trauma to the cranium, the upper part of the head, represents a single gunshot injury that, again, entered slightly to the left of center in the frontal bone and exited slightly to the right of center in the occipital bone in the rear of the skull." Dr. Simmons further testified that because the gunshot wound to Kelly's skull was a "through-and-through wound[,]" and because of the "very large degree of fragmentation of the skull," the type of trauma caused to Kelly's skull was either the result of (1) a "very high-velocity gunshot injury[,]" or, in the alternative, (2) a lower-velocity weapon was used but Kelly's head must have been positioned tightly against a hard surface.[3] Dr. Simmons testified that she was able to make this deduction— regarding the trauma to Kelly's skull—due to her extreme familiarity with high-velocity gunshot injuries from investigating war crimes overseas.

Dr. Simmons went on to explain that the gunshot wound to Kelly's skull "caused extensive damage at the exit, which is fairly normal, and that damage extended all the way down onto the base of the skull, including the first cervical vertebra, because that first cervical vertebra is attached very tightly to the bottom of the skull with ligaments." Explaining further, Dr. Simmons testified that "if there is gunshot trauma and the radiating fractures from the projectile reach the base of the

---

[3] When asked for examples of what constitutes a "hard surface" for the purpose of her analysis of the exceptional degree of fragmentation to the back of Kelly's skull, Dr. Simmons explained that it would have to have been something such as "standing against a wall, lying on the floor, but definitely not a soft surface, such as a bed or a couch or something along those lines."

skull and break it, they will also break that first cervical vertebra, which is what happened in this case." As it relates to the timing, because Kelly sustained a gunshot wound to the head and her head was later severed from her body, Dr. Simmons testified that, based on her experience, "the gunshot injury occurred first because of that damage to the first cervical vertebra." Dr. Simmons further opined that, in order for the damage to extend to the first cervical vertebra, it would have been necessary for there to have been "muscle tone [in Kelly's head] at the time that that injury occurred[,]" and if Kelly's head had been severed prior to the gunshot wound, Dr. Simmons did not believe the damage would have extended down to that vertebra.

Finally, the following is the challenged portion of Dr. Simmons' testimony:

> [STATE]: And based on seeing this through-and-through wound and it being rendered by a projectile and the caliber of weapon that you theorize, in your opinion, what would be the likelihood that a projectile, through-and-through projectile, would render zero defects in a fiberglass bathtub?
>
> [DR. SIMMONS]: I think that would be slim.

Defendant concedes that Dr. Simmons was eminently qualified in the field of forensic anthropology but argues that "the State did not show that Dr. Simmons was also an expert in materials science, construction, civil engineering, or another related field such that she could offer a reliable answer to the question" regarding defects to a fiberglass bathtub. Because of this, defendant contends that he should receive a new trial. We reject defendant's argument.

This Court rejected a similar argument in *State v. Figueroa*, 291 N.C. App. 610, 896 S.E.2d 188 (2023). In *Figueroa*, the defendant was charged with several drug-related offenses after a brown paper bag—containing a white, powdery substance suspected to be methamphetamine—was recovered from the defendant's vehicle and sent off for forensic drug testing. *Id.* at 611, 896 S.E.2d at 190. At trial, Brittany Meyers, the forensic scientist who examined the suspected methamphetamine, and was tendered and qualified as an expert, "gave expert testimony that she performed a preliminary color test known as the marquis color test and a confirmatory infrared spectrophotometer test from which she identified the evidence in this case to be methamphetamine." *Id.* at 614, 896 S.E.2d at 192 (internal quotation marks omitted). And, "[a]lthough Meyers identified the analysis that she performed, she did not explain the methodology of that analysis[, t]hus the trial court erred by failing to exercise its gatekeeping function." *Id.* In concluding such, this Court held that the error "d[id] not amount to plain error because Meyers identified the tests she performed and the result of those tests[,]" *id*, and her testimony, therefore, "did not amount to baseless speculation, and thus[,] was not so prejudicial that justice could not have been done." *Id.* at 614–15, 896 S.E.2d at 192 (internal quotation marks and citation omitted).

Here, applying the rationale used in *Figueroa*, we reach the same conclusion. We conclude that the trial court erred by not properly exercising its gatekeeping function of Rule 702(a)—because it did not require Dr. Simmons to testify to the

rationale supporting her opinion regarding the potential for defects to the fiberglass bathtub caused by a high-velocity gunshot injury—but this error does not amount to plain error. *See Figueroa*, 291 N.C. App. at 614–15, 896 S.E.2d at 192 (explaining that at the defendant's trial, the forensic scientist gave expert testimony about the scientific tests that she performed on the narcotics, but she did not explain the methodology of her analysis). This error does not amount to plain error because Dr. Simmons explained the analyses she performed on Kelly's skull and the factors that led to her opinion. Dr. Simmons was absolutely qualified to testify about the trajectory, velocity, and impact force of a bullet upon exit, and her testimony "did not amount to baseless speculation, and thus, was not so prejudicial that justice could not have been done." *Id.* at 614–15, 896 S.E.2d at 192 (internal quotation marks and citation omitted). Dr. Simmons did not testify about the chemical compound, structure, makeup, etc. of a fiberglass bathtub. Rather, she offered expert testimony, in the form of an opinion based on her knowledge, skill, experience, training, and education, about the likelihood of a high-velocity projectile—like the bullet that entered and exited Kelly's skull—rendering defects on a substrate, such as a fiberglass bathtub. Thus, we conclude that the trial court did not commit plain error.

## B.    Closing Argument

In his second argument, defendant contends that the trial court committed reversible error by failing to intervene *ex mero motu* during the State's closing argument. We disagree.

### 1. *Standard of review*

"The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *State v. Storm*, 228 N.C. App. 272, 279, 743 S.E.2d 713, 718 (2013) (citation omitted). "Under this standard, only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Degraffenried*, 262 N.C. App. 308, 310, 821 S.E.2d 887, 888 (2018) (brackets and citation omitted). "To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *Id.* (citation omitted).

### 2. *Analysis*

According to N.C. Gen. Stat. § 15A-1230,

> [d]uring a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice.

N.C. Gen. Stat. § 15A-1230(a) (2023). "We tender this statute to all counsel for review and compliance therewith as officers of the court." *Degraffenried*, 262 N.C. App. at

310, 821 S.E.2d at 889.

"A criminal defendant has a constitutional right to plead not guilty and be tried by a jury[, and r]eference by the State to a defendant's failure to plead guilty violates his constitutional right to a jury trial." *Id.* (brackets and citation omitted). "This Court's job is to determine whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Branche,* 291 N.C. App. 214, 233, 895 S.E.2d 597, 610–11 (internal quotation marks and citation omitted). Here, defendant challenges a portion of the State's closing argument as violating his constitutional right to plead not guilty.

As the State correctly articulated in its brief, defendant challenged a portion of the State's thirty-six page closing argument that came after the prosecutor briefly reminded the jury of his opening statement and then, at great length, outlined the "red herrings" or distractions that he expected defense counsel to argue in closing, such as: unsupported allegations of mistrust in law enforcement; defendant's inebriation; missing gunshot residue; emphasis on other stories told by defendant; Kelly's mental health diagnoses; the medical examiner's conclusion of "undetermined"; and defendant's stipulation to other crimes. Within this same context, the prosecutor argued:

> This is what you're actually going to be tasked with going through.
>
> The offenses that are charged: [t]he defendant's been charged with possession of [a] firearm by a felon. And the

> State has to carry the burden on each of these offenses. First the State has to show that the defendant was a convicted felon. That's an easy check box. [Defendant] stipulated to it. You heard him talk about how he was a convicted felon.
>
> Second, that the defendant possessed a firearm. Again, easy. You know it. He took the firearm to the dumpster where he disposed of Kelly's remains, and then he took the police there. You know that's the case.
>
> Concealment of human remains. There's going to be three elements to this offense that you will have to go through: First, the defendant knowingly and willfully dismembered or destroyed human remains by removing body parts or by obliterating any portion; second, that doing so, the defendant intended to conceal the death of another person; and, third, that the defendant knew the human remains were of a person that did not die of natural causes.
>
> [Defendant has] admitted to every one of those things. It's before you today. The *defendant didn't plead guilty* to [murder] because he's going to stand up here and ask you to only find him guilty of [possession of a firearm by a felon and concealment of human remains]. *It's a distraction.*

(Emphases added). Therefore, the prosecutor did not reference defendant's decision to plead not guilty as "a targeted attack on [d]efendant's failure to plead guilty[,]" *id.* at 233, 895 S.E.2d at 611, but instead, it was to illuminate to the jury another distraction tactic the prosecutor anticipated defense counsel utilizing in closing—and the prosecution said as much: "It's a distraction." Additionally, defendant has failed to demonstrate how the challenged commentary "so infected the trial with unfairness that [it] rendered the conviction fundamentally unfair." *Degraffenreid*, 262 N.C. App. at 310, 821 S.E.2d at 888 (2018) (citation omitted). Thus, we conclude that the

prosecutor's commentary regarding defendant's decision to plead not guilty was not improper, much less grossly improper, and the trial court did not commit reversible error by failing to intervene *ex mero motu*.

### III. Conclusion

Based on the foregoing reasons, we conclude that the trial court did not commit plain error by admitting Dr. Simmons' expert testimony regarding the likelihood of a high-velocity projectile, such as a bullet, to cause defects to a fiberglass bathtub. We further conclude that the trial court did not commit reversible error with regard to the State's commentary during its closing argument.

NO ERROR.

Chief Judge DILLON concurs by separate opinion.

Judge MURPHY concurs in Part II-A and concurs in result only in Part II-B.

DILLON, Chief Judge, concurring.

I concur in the majority opinion. I write separately regarding the admission of portions of Dr. Simmons' expert testimony which Defendant argues was outside the scope of his expertise. Defendant failed to properly object to this testimony, and I do not believe the trial court had a duty to intervene to strike the testimony. Accordingly, I do not believe the trial court erred, much less plainly erred. In any event, I agree with the majority there was, otherwise, no prejudice to Defendant from this testimony.